Cascabel Cattle Company, L.L.C v. USA Cascabel Cattle Company, L.L.C v. USA Mr. Sanchez, whenever you're ready. Thank you, Your Honor. May it please the Court. My name is Dennis Sanchez. I represent the three appellants in this case, all three of which are small cattle ranchers in South Texas. We're here today because of the ruling that was made by the magistrate, wherein he ruled that our claim for the loss of cattle was precluded by the exception under the Federal Tort Claims Act, which the quarantine exception, as we'll call it. The quarantine exception, initially the government raised two exceptions. One was the discretionary exception. Subsequently, and also concurrently, the quarantine exception. The magistrate judge found that because the government employees were bound to follow the regulations that they had adopted, the guidelines is what we called them in our brief, that there was no discretion and therefore they were precluded from availing themselves of that particular exception. However, the court then went on to look at the quarantine exception and gave a broad interpretation to it. We contend that it was too broad and that it basically cuts us out. Essentially, the effect of what the MMR does, it makes the agency the judge, jury, and executioner of all of its activities. There's no judicial vigilance. There's no administrative vigilance. There's just no vigilance. In this case, what happened was there was a chemical called Corral, which is a Kumafos, which was developed in the 1930s in Germany. It's applied to the cattle to kill ticks. But on the label of Kumafos, it says, you shall use this only as directed. It has the directions regarding the frequency of application of this chemical to the cows and the potency of application. And then so you have that particular mandate, federal mandate, federal law, and it says it shall be a violation if you don't follow the label on the bottle. Then you have the... It's a negligent execution of the quarantine. Yes, sir. But it is a part of the execution of the quarantine, negligent or otherwise. Well, the mandate is you shall follow the label, and if you don't follow it, you're violating... I understand your theory of liability is that the government negligently or the officials negligently executed the quarantine program. Yes, Your Honor. But in acknowledging that, in making that argument, you have to acknowledge that this was, in fact, in the execution of the quarantine program. Absolutely. So why does that not fall squarely within the text of the exception? Because do you believe that Congress would have passed a law presuming that the agency would violate other federal laws in order to accomplish the objective of its quarantine? Not only that, you have guidelines which were mandatory on the government agency employees during the quarantine, which they completely violated. I'm not sure how that argument works. I mean, the whole point of sovereign immunity is the acknowledgement that you might have an action that is otherwise valid, otherwise meritorious, but nevertheless runs into sovereign immunity. Sovereign immunity doesn't exist just to weed out bad claims. It also will weed out good claims. Well, the point we're trying to make is that if you're going to do something as a governmental agency, do it right. Do it according to your own guidelines. Those are mandated procedures. Respectfully, I think you're just challenging sovereign immunity. Under your theory, there should be no sovereign immunity. No. I think there's a harmonization there that's available. Please. The harmonization is this. If you look at the Dolan case, Dolan v. U.S., Supreme Court case, which is saying there were 13 exceptions to this rule, to the statute, 13 of which use the word arising under, which the case law seems to paint a very broad deference to that verbiage. Then there's two other exceptions. One is called caused by, and that's the Treasury exception. In this case, the quarantine exception. Now, if you look at the Ray case, the Ray case from the Fifth Circuit applied for the first time the word proximate cause. They talked about the proximate causation. It took it a step further because the government was, I mean the magistrate's report basically said, well, it was imposed. It was imposed, and therefore, since it was imposed, that contemplated not only the decision to make the quarantine, but also the subsequent execution and management of the quarantine. So when you're focusing on the text of the statute and you're saying here the death to the cattle was not caused by the imposition of the quarantine. It wasn't its imposition or it wasn't a quarantine because it was treatment and not isolating the cattle. What's the exact argument? The exact argument that we're making is that the quarantine was a decision made to control ticks. Right. Okay. They make that decision. So the quarantine encompasses the treatment. You don't dispute that. Right, and if you look at the verbiage, if it encompassed the treatment, then you would have anticipated that it encompassed the treatment prescribed by the agency, which is follow the label and follow the guidelines. The argument you're making is one of sort of an intervening cause, defeats what otherwise would have been caused by, approximately caused by, reasonable foreseeable. So when the government decides to corral the cattle in and then execute the corral, it's foreseeable that they would do it without enough ventilation, and that would normally give the government sovereign immunity under this. But you're saying there was an intervening cause. Yes. The negligent, non-following up the label. That's correct. And what's your best case? Because you argued that, I think it's on page 13 of your brief, but you don't give us a case, and they respond to that. Well, we couldn't find a case, basically, but basically what we were trying to do is draw the analogy between the Ray case, which looked at the issue of proximate causation. But the Ray does give that example of, oh, this would be incidental to a quarantine if someone were drunk driving. But you've agreed that the treatment isn't incidental. The treatment was the whole purpose, kill the ticks. So the proper treatment was the purpose of the quarantine, not the improper treatment of the cattle. And by violating their own guidelines, their mandated guidelines, they basically went off course and became negligent. So is your view then, I think you're acknowledging this was part of the establishment of the quarantine program, it was just the improper establishment? Yes. But at least as a textual matter, there's no proper improper distinction in the text. It just says as long as your damages was caused by the establishment of the quarantine, proper or otherwise. Well, the analogy that we envisioned was the application of the first problem of Gaudet because Gaudet looked at the issue, and were they required to follow the guidelines or were they not required to follow the guidelines? Let me interrupt and ask a sort of basic question. CFR 72.15 requires the execution of a waiver of claims. Was this not executed in this case? I believe for a couple of my clients there was, and for another one there was not, to the best of my recollection, sir. Well, for those that executed the waiver, how do they have a claim? They didn't know what they were signing, obviously. They didn't know it would arise to this level. They did not know that their cows were going to die. But that's not what this case is based on. This case is based on the improper application of the corral in violation of their own mandated guidelines. If they signed this waiver under 72.15, it doesn't matter that there was subsequent negligence. They're required by the statute to do that. That's what it says. Agree to waive all claims against the United States. Your Honor, that wasn't, I don't believe that was briefed nor was it addressed in the MR&R. So I can't answer that other than the fact that I believe that a couple of my clients may have executed that waiver and another one did not. But irrespective, if you want to go take it one step further, look at the ELAP program. The ELAP program is supposed to compensate ranchers when they lose cattle. Two of the clients didn't even know about the existence of the program. The third did. He filed the application with the FSA, Farm Services Administration, who then requested that the Department of Agriculture transfer the information over to them so they could process the claim. And the Department of Agriculture refused to transfer the information. So, you know, at ground level, it's a little bit different than where it is where we are today. Well, but just very quickly on that ground level so I understand the context, what you two are just discussing is that in order to get the free tick treatment, generally the ranchers have to sign this waiver? Is that essentially how this works? No. The way it works is that you are mandated criminally, if you don't comply, to gather your cattle up every 14 days and to submit them for inspection at your own cost and at your own risk. And then you do that. If they find ticks on the first scratch, as they call it, the first inspection, if they find a tick, you have to continue to gather them up every 14 days and have them dipped and scratched until there's two. My only question is where do the waivers come in? Is that discretionary? Well, at the very outset, they present these to the clients and say, here, you've got to sign this and you've got to sign it, period. And if they refuse to sign it and or if they refuse to submit their cattle, then there's criminal sanctions for that. So I don't know how voluntary that waiver is. I don't know how negotiated it was. There was certainly no promise of it. Okay. So if it's mandated, so that means you then you don't, if you sign that, then you don't even need a quarantine exception because they're free, free to go. The issue here is are there any regulations that are going to be applicable to an agency that establishes guidelines and doesn't follow them, that is mandated by other federal laws? Back to Judge Ho's questions to you, but I think the quarantine exception is acknowledging that the country can face an imminent and immediate disease threat. And therefore, in order to quarantine people or livestock, it's expected they're going to move in quickly and they may use DDT or they may use whatever they do, even in a hurry negligently contrary to the labels. But the whole point then is that's foreseeable, and therefore they're exempt to try to contain the emergency that needed to be quarantined. Your Honor, if it was performed under a Gaudet analysis of two prongs, then I would agree with you. But in this case, there's no oversight whatsoever. And so for somebody to come in and say, well, here's our guidelines. Here's how you do it the right way, but we're going to do it the wrong way for whatever reason, and no way to question this, look at it. We have no way to question. There is no remedy here. None. That gets back to sovereign immunity. That's the law. Well, the purpose of this appeal is to bring it to this court for you all to try and give some light as to how agencies are supposed to act and whether or not you all feel that there's any oversight that's justified in this type of situation, because one oversight could, I mean, one infraction could lead to another infraction could lead to another infraction. Basically, there is no case law that we can find that gives the court the ability to say, no, you have to stop. You have to have some standard of conduct. But there is none here. They've established their own standard of conduct, but they didn't follow it. And so we're looking at the situation as to how can this be controlled so that everybody has their day in court. After all, they're destroying property rights. Whether or not it rises to the constitutional level, I do not know. But people are losing property here. And if it had been done right, perhaps we wouldn't have lost any property. But because they did it the wrong way, we're claiming that we lost property. So why can't the government be expected to do their job the right way? Why do we have to always let them take a free ride on their own negligence? If you were to substitute the ABC Corporation for the government, you'd win. But the government has sovereign immunity. And like it or not, that's what controls. Well, we're asking the court to engraft on the definition of this particular quarantine exemption the Gaudet requirement of the two-pronged requirement where they'd have to then the court would say, okay, it's a quarantine. Now let's look. Were they mandated to do it a certain way? And did they violate that? Yes or no? And the other prong is whether or not there was an action taken in order to protect the sanctity of the quarantine. Well, if this court were to adopt that rationale, you have harmony between these statutes because right now you have, and nobody's talked about this today, is a federal agency entitled to violate federal law? Are they? I mean, because that's what they did. And they're getting a free pass on that? Counsel, you have five minutes for rebuttal. Sorry. Mr. Rodriguez. May it please the court. My name is Jimmy Rodriguez. I'm an assistant U.S. attorney, and I'm here on behalf of the United States and the other federal defendants in this case. The Cattle Fever Tick Eradication Program has a longstanding and historical role in protecting the domestic cattle industry. For over a century, those in the program have worked to prevent a specific cattle fever tick, a specific tick, from entering the United States. They do this work through the use of quarantines, both a permanent quarantine zone and, as it relates to this case, temporary quarantine orders. So there's a permanent quarantine zone along the Rio Grande River, most of the counties that abut the river. But whenever they detect ticks outside of that permanent quarantine zone, the state, working with the Department of Agriculture, implement temporary quarantine orders. And that's what they did in this case. They put temporary quarantine orders on the properties of the cattle owners that are the appellants here. So once those temporary quarantine orders were put in place, the cattle on those properties were required to be presented for inspection, but then they were also required to be treated with corral. The ultimate issue presented here is whether the harms that the appellants complain of, the actions that were taken that caused those harms, whether they were caused by the implementation of the quarantine, the imposition of the quarantine, or were they incidental to the quarantine. Our position is that they were clearly required by the quarantine, and that is the actions that were taken were not only done to enforce the quarantine, to kill the tick, to prevent the spread. But opposing counsel's central sort of quite anguished thrust is that the government does allow torts to be brought against it, except for these exemptions. And I guess my threshold question is, you pointed it out, I think, but correct me if I'm wrong, the magistrate added an even stronger thumb in favor of the federal government when it applied the pre-Dolan deference. So if the lower court's ruling was sort of double deferential to the demand and led that court? No, Your Honor, I think based on the plain language of the exception itself and the overall purpose of the FTCA exceptions, which has been recognized by the Supreme Court on several occasions, Congress has decided to carve out certain governmental activities, certain vital government activities, and here it's the implementation of quarantines. And in carving those out from potential liability under the Federal Tort Claims Act, Congress has made the decision that it doesn't want those activities disturbed or for the persons implementing those activities to be hesitant or be in fear of being second guessed through the threat of a future litigation. To get this extraordinary immunity, the harm has to have been caused by, and that's quite a high standard, higher than others, correct? Higher than arising as a result of, yes. The imposition of a quarantine. All three have to exist. How, my question is sort of, is one that isn't as directly addressed in the briefs. How was this a quarantine at all? When they spray the treatment onto the cows, that isn't the isolating of the cows. That's taking a totally different step, which is treating the cows. What's the best authority that says a quarantine extends to treatment as opposed to just isolation? I think if, if, if the exception, the plain language of the exception said any damages caused by the establishment of a quarantine, then we would be squarely within the hypothetical, the example that your honor specified that did the quarantine itself cause a damage. Position gets you there because imposition sounds to me, the effectuation of the isolation, like you rounded them up and they died as they're going down. What I'm talking about is treatment doesn't sound like isolation to me. That has nothing to do with establishing or imposing that's doing something other than, and more than isolating. What case suggests that the government can actually now start treating people or things that it has quarantined and still get the benefit of immunity? Well, I would refer the court to the, the Ray decision in Ray. They gave several examples. One was the examples of things that would fall within the quarantine exception. The Ray court said that at the, the incorrect imposition of a quarantine, the negligent procedures, but this is I think the best example that I'm getting to the forced exposure of, of livestock to unhealthy animals, that that would be something that falls within the quarantine exception in here. As a result of federal regulation, there is a forced exposure of healthy animals to a very unhealthy chemical. A corral is hazardous. It's toxic, but it's the only pesticide that the federal regulations authorized this program to use in enforcing the quarantine. The government has a nationwide ban on a chemical like DDT. You're saying there would be no action, no cause of action here. If they said, you know, that's cheaper for us, we're going to use something that's prohibited. I think that if it were a national emergency, a health emergency and, and, and decision makers had decided that this was what needed to be done to protect the public health, that that would, that would fall within the quarantine exception. It would fall within the, the, the purpose that Congress envisioned. I mean, it may be, that's the case, but, but I keep, you keep thinking these quarantines aren't just for animals. They're for people as well. And your position, the government's position is we can not only isolate sick people or cows, but we have complete immunity in terms of how we treat them, what we inject them with. Yes. In order to further the purpose of the quarantine, presumably it's to prevent some disease or something from escaping a certain area. And so I would say, yes, if the purpose of the treatment was to combat that disease or that underlying harm or threat, that was the purpose for establishing the quarantine. Let me get back to a narrower part of this case. Yes, Your Honor. We're talking about cattle quarantines in these counties that abut the river. Yes, Your Honor. This isn't the first time. Is it? Don't they do that regularly? Yes, Your Honor. Does the record reflect that there has ever been a quarantine of cattle, not people, cattle in this area where they did not also administer a tick medicine? Not that I'm aware of, Your Honor. No. There was a time when there were, there were different types of pesticide that were permitted to be used in the program. But they always do a pesticide, right? That's part and parcel of the quarantine is a required inspection and a required dip treatment. So if there are no instances where they quarantine the cattle physically, ward them off, fence them or something, but they always use this pesticide. Yes, Your Honor. Okay. So it's an integral part of the quarantine. Yes, Your Honor. And it's an integral part that is regulatorily mandated. And when I say that, I'm not referring to the guidelines or state regs, but in chapter nine, part 72 of the federal regulations, the requirement that the corral be used, but then also the specifications of the types of treatment applications and the method of application that is permitted. The record said that the Texas rangers, their horses, no one's putting corral on them anymore. That they sort of said, you know, this is improper. We're even going to cite the federal authorities, not that spread. Is that incorrect? It's mandated. It's always corral. The, the, I think you're referring to the border patrol with their horses. And cause they ride up and down the border. And, um, I, and I believe that there is in the record that there is a different chemical that is used. Um, but that is not to effectuate a quarantine order as set forth in, in chapter nine, part 72. That's just a, a governmental preventative action that is being done for the border patrol, uh, horses that are along the border. But you're correct. You're correct. Your Honor that I believe it's not corral that's being used. So the federal government's livestock doesn't get the corral. The border patrol horses as I understand it. Yes, Your Honor. What about the waivers under 72.15? Uh, was this brought up in the trial? It was, it was not brought up, uh, to the court below. Um, I, I confer with my client about the waivers and, um, I was instructed that as a policy decision, that we were not going to argue that those waivers prevented a lawsuit from, from coming forward. So we, the government effectively waived that argument. And that's why it's not before the court and it's not discussed below. I think an important aspect of that provision in the federal regulations and in my view shows that, that it is contemplated that the use of these very toxic pesticides and chemicals on cattle could very well lead to a loss and death. Yes, Your Honor. Yes, Your Honor. Again, it's my first time understanding this. Of course his clients live at all the time as do yours. It would seem to me when we're talking about part and parcel of the program, these compensation mechanisms would be generously granted. You deal with it in footnote 15 only. And you couldn't quite make sense of why his clients wouldn't be paid for the cattle that had toxic levels of corral put on them. Yeah. Does they miss deadlines? No. And Your Honor, I, in re-reviewing the briefs and that, that footnote was not particularly well-worded and I apologize for that. The point that I was making was that if, if my client, the USDA had not properly administered the ELAP program, the remedy wasn't to, to ignore the, the limited waiver of sovereign immunity. The remedy would be to hold the USDA accountable. Why, why was this program not properly administered? I think it would be an APA based lawsuit, the arbitrary and capricious behavior agency action unlawfully withheld or unreasonably delayed. But of course my, my client should be administering this program properly. There was the allegation that it was not done properly below, but that was not explored factually. You're saying it could be an APA claim. If the ELAP program was not. If right, if they're stipulated, would there be a Tucker Act claim, a takings claim as well? I have not thought about that, Your Honor. I'm sorry. Again, I want to make sure, does the record reflect whether there are ever quarantines without administering, for ticks, without administering an anti-tick? No, Your Honor. Every time there's a quarantine, the pesticide is applied. I just want to briefly address the, the argument that opposing counsel made about harmonizing statutes and, and the, the label requirements in the federal law requiring anyone who uses a pesticide to comply with the label. First of all, there was a lot of robust back and forth, and we strongly contest whether we've violated the label restrictions or not. But of course the court need not and should not reach that issue. That is very much a merits argument on whether we should or should not be liable, assuming that there is a waiver of sovereign immunity here. The threshold legal issue is whether the quarantine exception applies because the quarantine exception applies. The court should not go further and explore whether we violated the label restrictions or whether we acted in a reasonable. Isn't that sort of inherent in what the Ray court did? In other words, in order to assess proximate cause, we've got to look a little bit and his argument, at least in the brief, I thought was, well, there was an intervening cause that was not foreseeable. They would never have imagined that the, the spray would be done in a box that had no ventilation. So we have to look a little bit at those facts to make the jurisdictional determination. You certainly do have to look some at the, at the facts and what happened and, and what were the circumstances under which these, these cattle were treated. I think the difference is the, the idea of attempting to harmonize different statutes or, or federal or obligations that the federal authorities were under goes more into the merits versus the approximate cause analysis, which is our position is controlled by, by the regulations themselves, which are necessitating the actions that judge Wiener mentioned that, that once the quarantine is in place, every cattle, every livestock, all livestock in that quarantine zone must be treated with the pesticide. And in here it's corral. And then the, of the methods of application that the regulations authorize. So unless your honors have additional questions, I'm completed my presentation. And we would ask that for the reasons we stayed in the brief and for the reasons articulated by the lower court that you affirm the dismissal of the consolidated cases. Thank you. Thank you. Just got a few more comments to clarify one thing about the, the quarantine. There is a permanent quarantine area along the Rio Grande river along Brownsville and Cameron County, Texas. The quarantine areas that we, that are part of this case are not that permanent quarantine area. These are areas North of that quarantine zone. And, and yes, your honor is correct. When they do quarantine temporarily, as they have done here it does involve the application of chemicals. So you never argued below and it wouldn't make sense to argue that treatment is different than isolation. The quarantine doesn't encompass treatment. That hasn't been your argument at all in this case. My argument was that the quarantine was a decision. If I could just point to the court to something, and I think this was said by the magistrate judge, it said, as the court has noted, well, Tuscarora seeks to separate the decision to declare a quarantine from how the quarantine was actually applied to its livestock stating that it is not challenging the decision to impose a quarantine, but the subsequent negligent and illegal actions taken by the defendants representatives. So, so that's, that's our point. There are ticks there. So there is, there should be a quarantine. However, the, how you handle the quarantine from that decision point on is why we're here because we believe that it was not administered the way that we would have anticipated. It should have been by virtue of the regulations in place and the laws in place. Also, I'd like to refer to the court to the footnote number four on the rate case. I may read it. And it says a fair reading of section 28, 26, 80 F, any claim for damages caused by the imposition or establishment of a quarantine by the United States renders that section, a bar only to damages approximately resulting from quarantine status. And we have a status as a quarantine where we're, and the rate case talks about the diminution of value because during the holding period of, of the quarantine. And here we have the, the destruction of personal property by virtue of subsequent actions taken because of the quarantine. That's the distinction we're asking the court to try and, and expand on and clarify so that we don't have to come up here again, a couple of years from now. Thank you very much. Second case is submitted. We will take a 10 minute recess before we hear the.